E. A. GLOVER, et al. v. S. B. HOLMAN, et al.

Western Section. October 29, 1927.

No petition for Certiorari was filed.

1. **Sales. Warranties.** Where there is no expressed or implied warranty a seller is not liable for defects unknown to him.

In an action to recover the price of certain hogs where it was shown that immediately after the hogs were sold they began to die with cholera but the evidence showed that at the time of the sale the seller did not know that they had cholera, held that in the absence of an express or implied warranty the seller would not be liable for the loss of the hogs.

2. Sales. Damages. Measure of damages for wilful concealment of diseased condition of stock.

If a seller knows that stock is diseased and wilfully conceals the fact from the buyer he is liable to the buyer for all damages that necessarily and naturally flow from his acts.

3. Sales. Warranties. Evidence. Evidence held to show warranty.

Evidence in the instant case examined and held to show that the seller sold the hogs to be sound and well.

4. Sales. Warranties. Where stock is sold under a warranty that it is healthy the seller is liable for all damages caused by the stock being sick.

Where there is an express warranty as to the health or soundness of the animals sold, and where the seller knows that the animals are to be mixed with other animals of the purchaser, and that such other animals will thereby be exposed to the infection the seller would be liable to the purchaser, and would be liable for all damages resulting from the infection spreading to other animals. In other words, the seller is held for all damages occasioned by a breach of such warranty of soundness which are the natural and proximate result of the diseased animals coming in contact with sound animals.

5. Sales. Damages. The buyer is bound to use reasonable care to reduce the seller's damages.

In an action for the value of hogs where the evidence showed that soon after the sale of the hogs they began to die and practically all of them died and the evidence further showed that the buyer did not take proper precautions in having the hogs vaccinated and other hogs out of the same herd that were properly vaccinated did not die, held that the buyer could recover only for the hogs that the evidence showed would have died if all of the hogs had been vaccinated properly.

Appeal from Chancery Court, Obion County; Hon. V. H. Holmes, Chancellor.

Modified and affirmed.

Pierce & Fry, of Union City, for appellant.

Fenner & Heathcock, of Union City, for appellee.

SENTER, J. On May 10, 1926, complainants E. A. Glover and E. W. Youngblood sold and delivered to the defendants S. B. Holman and son, S. W. Holman, 184 head of hogs for the price of $1745. These hogs had been purchased by Glover and Youngblood in Louisiana, and were shipped to Union City, Tennessee, and unloaded from the stock car into the stock pen of the Mobile & Ohio Railroad of Union City, on Sunday, May 9th. The car contained about 210 head of hogs. Youngblood had called the complainants over the telephone on Sunday, May 9th, and informed them that he had these hogs for sale. On Monday morning, May 10th, the defendants Holman and son came to Union City and were met at the stock pens by Youngblood, and after some conversation between the parties, the defendants Holman and son purchased 184 of the hogs at the price of 12½ cents per pound, and gave to the complainants Glover and Youngblood a check drawn on a bank of Fulton, Kentucky, for the amount of the hogs, and on that date loaded the hogs into trucks, where they

were taken to the farm of defendants near Fulton, Kentucky, on the afternoon of May 10th. The remainder of the car load of hogs, about thirty-two, were sold to a Mr. Cloyes. On Wednesday morning, May 12th, one of the hogs was found dead, and two others the following morning, and a number of the other hogs appeared sick and showed decided symptoms of cholera. The defendants stopped payment on the check before it had been paid. 139 of these 184 hogs died of cholera. The complainants Glover and Youngblood sued the defendants on the check. The defendants filed an answer in the nature of a cross-bill, and in which they alleged that the complainants had warranted these hogs to be sound at the time the same were purchased, and that the hogs were unsound at the time the same were purchased; that they were then diseased hogs and infected with cholera; that one of the complainants, Youngblood, was a licensed veternarian; that he knew or should have known from the appearance of the hogs at the time of the sale that some of them then had cholera, and that the other hogs had been exposed to cholera. The answer and cross-bill further alleged that cross-complainants only had one sow and four pigs on the farm to which these hogs were taken, and that this sow and four pigs became infected with hog cholera and died a few days after the diseased hogs were taken to the farm. The answer and cross-bill alleged that cross-complainants still had the remainder of the hogs in their possession and holding the same for cross-defendants; that the sale was fraudulent and void, and that cross-complainants were entitled to recover of cross-defendants for the cost and expense of vaccinating the hogs, and feeding and caring for the hogs, and also for the value of the sow and four pigs to which the disease was alleged to have been communicated and from which they died, and to have the check cancelled.

The cross-defendants answered the cross-bill, and denied that at the time of the sale they had any knowledge of any disease among the hogs; and denied that they represented that the hogs were sound; and denied that they warranted the hogs to be sound, and denied the material allegations of the cross-bill.

At the hearing of the cause the Chancellor found and so decreed that there was an express warranty as to the soundness of the hogs, although he states in his opinion filed with the record as follows:

"I am not at all convinced that any express warranty of soundness was made, but I think there is a preponderance of proof in favor of cross-complainant on this question, and that it must be held, as a fact, that there was an express warranty of soundness."

The Chancellor further held and so decreed that by a preponderance of the evidence there was hog cholera among this lot of hogs at the time this sale was made. The learned Chancellor states on this

subject as follows: ''There can be no doubt, upon the proof that some of these hogs had cholera at the time of the sale. And it follows that at the time of the sale all of them had been exposed to the infection.'' The Chancellor further found that by a preponderance of the evidance that such of the hogs as died within ten days after the sale, were infected at the time of the sale, and that under the warranty of soundness the cross-defendants would only be liable for the value of such of the hogs as were actually diseased or infected with the disease at the time of the sale, and that the proof showed only eleven of the hogs, of the value of $115.25, died within ten days from the date of sale, and allowed a deduction of that amount from the check sued on, and decreed a judgment in favor of original complainants for the net balance, the sum of $1629.75, and taxed one-half of the costs to the original complainants and one-half of the costs to the original defendants.

From this decree of the Chancellor the cross-complainants Holman and son prayed an appeal to this court, and the appeal has been duly perfected and errors assigned. The cross-defendants, Glover and Youngblood, have filed the record for error, and have assigned as error the finding of the court that there was an express warranty of soundness of those hogs, and the action of the court in decreeing that under the alleged warranty cross-complainants were entitled to a credit of $115.25 as decreed by the Chancellor, and in taxing original complainants with one-half of the costs of the cause.

We concur in the finding of the Chancellor to the effect that at the time of the sale the original complainants did not have any knowledge that any of the hogs sold to defendants were diseased, or that they had been exposed to cholera. While both S. B. and S. W. Holman testify that when they examined the hogs in the stock pen at Union City a few of them appeared to be limping, and called Youngblood's attention to this. Yet, we think that by a decided preponderance of the evidence there was nothing in the appearance of the hogs that indicated that they were diseased. Dr. Youngblood is a veternarian, and he testified that he saw nothing in any of the hogs that indicated that they were diseased, or that they were infected with the cholera and that all of the hogs appeared to be in good condition. Mr. Nash, who was present at the time the hogs were unloaded on Sunday, and also Monday morning following, and who claimed that he fed the hogs, testified that all of the hogs appeared to be sound and in good condition. Mr. Cloyes, who bought about thirty-five head of these hogs, out of the same car and out of the same lot, testified that the hogs appeared to be sound and in good condition with the exception of one that had been crippled in shipping, and that another one died after he had removed them to his farm because of having become heated, and that all of the hogs appeared to be sound and in good condition. At the time the defendants purchased these hogs they

desired to have a number of them cut out and not included in the sale, and that after some discussion, they were permitted to cut out all but 184 of the hogs, and cut out such of the hogs as they desired to have cut out. We think there is no doubt under the evidence but that there was cholera present in this lot of hogs at the time the same were sold and delivered to the purchasers, and that some of the hogs among the lot were infected with cholera at the time of the sale, but that the disease was not developed to the point that it could be detected, even by a skilled veternarian, and this fact was not known to Dr. Youngblood at the time he made the sale. This was the conclusion reached by the Chancellor, and in which we fully concur.

In the absence of an express or implied warranty as to the soundness of these hogs at the time of the sale, we are of the opinion that the seller would not be liable under the facts of this case. If there was anything in the appearance of the hogs, or any condition present to indicate cholera infection among the hogs at the time of the sale known by Dr. Youngblood, and was of such a latent nature that the purchasers who were laymen and not veterinarians, and did know it was the duty of Dr. Youngblood to have communicated this fact to the purchaser, and a willful concealment of this condition, would have been fraud and deception upon the part of the seller, and for which the seller would be liable to the purchaser, not only for the value of the hogs actually infected at the time of the sale but to such other of the hogs, or other hogs of the purchaser to which the disease was communicated, where it was known by the seller that the hogs were bought to be fed and would remain together, and all of them thereby become exposed to the disease. In the early case of Jeffrey v. Biglow, 28 Am. Dec., 476 (N. Y.), the measure of damages was set out in the following excerpt:

"The plaintiff is entitled to such damages as necessarily and naturally flow from the acts of the defendants. That damage is not the mere difference between a diseased sheep and a healthy one, but the damage sustained by communicating the disease to complainant's flock. It appears, by the testimony, that the disease is highly contagious, and in a large flock extremely difficult to cure. Had the defendants employed persons to have gone through the plaintiff's flock and innoculated his sheep, the disease would not, probably, have been communicated with more certainty than by turning among them a few diseased sheep."

In that case it appeared that the defendant, through an agent, sold to the plaintiff sheep that were infected with a highly contagious disease, and the agent knew of the infection at the time of the sale, but the purchaser did not know it. The seller knew that the sheep were being purchased to be mixed with a large flock of sheep owned by the purchaser. There was no implied or express warranty as to sound-

ness. The disease was of a latent type, and such as would not be discovered by the purchaser in the exercise of ordinary care. It was held in that case that the rule of caveat emptor did not apply, and that the purchaser perpetrated a fraud on the seller, and was liable not only for the value of the diseased sheep sold to the purchaser, and which died of the disease, but was also liable for the consequential damages resulting from the mixing of the diseased sheep with the sound sheep of the purchaser, and to which the disease was communicated by the infected sheep. Numerous other cases could be cited in support of the rule there announced, but in the view of the case we have taken the question of fraud does not enter into the present case, since we fully concur in the finding of the Chancellor, that there is no proof in the record, or any facts or circumstances, that would warrant the conclusion that the seller, Youngblood, knew, or had reason to know, that there was any cholera in this lot of hogs at the time he made the sale. To the contrary, we are of the opinion that, by a decided preponderance of the evidence there was nothing in the appearance of the hogs that would indicate to Youngblood there was any cholera present in the herd or that any of the hogs had been exposed to cholera. They had been shipped under a permit as shown by the bill of lading and way bill. Youngblood advised the purchaser that they had been shipped under a permit, and that the hogs had not been vaccinated, and that it was proper to vaccinate the hogs, and that Holman should vaccinate the hogs promptly. So we do not have any question of fraud involved under the facts in this case. It then resolves itself into a question as to whether there was an express or implied warranty as to the soundness of these hogs at the time the sale was consummated, and if so the proper measure of damages, where it subsequently develops that at the time of the sale some of the hogs were unsound and infected with the highly infectious disease of cholera.

The evidence in the record on the question as to whether there was an express or implied warranty is confined to the testimony of four witnesses. On this question S. B. Holman testified as follows:

"Q. Now after Dr. Youngblood came up just tell what passed between you and him. A. Well, he asked if we were the men that wanted to buy the hogs and we told him we were, and I asked him, 'Dr. Youngblood, are those southern hogs?' And he said 'Yes.' I asked him if they had been vaccinated and he said they had not, and I asked him how he got them in without being vaccinated and he said with a permit, and I said your hogs look tough and bad, and he said yes, they couldn't look any other way, for they hadn't had anything to eat or drink for three days or nights, and I asked him what was his price on them, and he said 12½ cents, I asked him if they were sound, straight, and alright, and he said they were, that they couldn't be any

other way for he bought them from a reliable man. He said 'I bought them sound, straight and alright, and I can sell them that way.' "

He further stated that there was no one present except Youngblood and his son and himself at the time this conversation occurred. He further testified as follows:

"Q. Well, did you, he and your son examine the hogs? A. Just looked at them. When we were looking at them I asked him if I took them at 12½ cents how many he would throw out. The roughest ones, some very old ones, and some stages. He asked me how many I would want him to throw out, and from just looking at them, and from that standpoint, I told him about thirty-five, and he said he couldn't do that, and I told him alright. Then he said he would throw out fifteen, and I said I did not want them; he said well he would throw out twenty, and I told him no, so he went and talked to Nash and when he came back he said he would take out twenty-five, and I told him no. He went off again and talked to Nash, and when he came back this time he said he would take out thirty, I asked my son what he thought about it and he said he guessed we had better take them so we went back and began to settle with him.

"Q. Was anything said about the condition of the hogs, their health? A. No, sir.

"Q. Say whether or not you would have bought the hogs but for the fact he stated them to be straight, sound and alright. A. I would not."

S. W. Holman testified on this subject as follows:

"Q. What conversation took place between you, he and your father? A. Well he asked if we were the Holmans that wanted to buy the hogs, and we told him we were. My father asked him if they were southern hogs and he said they were. My father also asked if they were sound, straight, and alright, and he said they were, that he bought them from a straight man. We remarked that the hogs looked tough and bad, and he said yes, they couldn't look any other way for they hadn't had anything to eat for three days and nights. We asked him his price on them and he said 12½ cents per pound.

"Q. And you say he told you these hogs were straight, sound and alright? A. Yes, he did.

"Q. Would you have bought these hogs had he not represented them to be sound, straight and alright. A. No, sir."

Dr. Youngblood, in his examination in chief, was asked the direct question if he warranted or guaranteed the soundness of these hogs to the Holmans, and he answered that he did not. On cross-examination he was asked and answered as follows:

"Q. They inquired as to their physical condition, and Holman asked you point blank if they were straight, sound and alright. Didn't he? A. Mr. Holman asked me if there was a health certificate

with the hogs, I told him no, I didn't think so, but there was a permit. He asked me what I meant by permit, and I told him that the hogs vaccinated at the other end did not do as well as vaccinated at this end, therefore for the safeguard of the owner states accepted permits and let hogs be shipped interstate. I told him they were good feeders, and I had not seen the hogs or owned them only a short time, and as far as I knew, and the appearance of the hogs, they were perfectly sound."

The only other witness that testified on this subject, was Mr. Nash, who it appears was employed by complainants to assist in the sale of these hogs. He testified that he was near the parties at the time the sale was made, and that complainants did not guarantee or warrant the hogs to be sound. However, it appears that this witness did not hear all that passed between the parties.

From this evidence the Chancellor held that there was an express warranty of soundness shown by a preponderance of the evidence, and taking all the facts and circumstances in connection with the transaction, and the testimony of the witnesses on this subject, we are of the opinion that there was a warranty as to the soundness of these hogs which induced the sale, and that the purchasers relied upon this warranty in purchasing this lot of hogs. Then the question of the proper measure of damages under the facts and circumstances of the case is presented for consideration and disposal. In the notes to the case of Hobbs v. Smith, 27 Okla., 830, and reported in 34 L. R. A. (N. S.), and in which note the question of the measure of damages for the sale of diseased animals under a warranty of soundness is discussed. In the notes to the above case at page 698 it is said:

"A few cases draw a distinction between cases wherein the warranty is general and those cases wherein there is a special warranty as to freedom from disease. Of course, a breach of either would permit recovery of the difference between the value of the animals purchased in their diseased condition, and their value if they had been sound, as represented, which is the general rule in case of breach of general, warranty as to soundness."

To this effect are Cummins v. Ennis, 4 Penn. (Del.) 424, 56 Atl., 377; Louis v. Bracken, 97 Ga., 337, 22 S. E., 943; Crabtree v. Kyle, 21 Ill., 180, and numerous cases cited under said note.

We are of the opinion that where there is an express warranty as to the health or soundness of the animals sold, and where the seller knows that the animals are to be mixed with other animals of the purchaser, and that such other animals will thereby be exposed to the infection, that the seller would be liable to the purchaser, and would be liable for all damages resulting from the infection spreading to other animals. This seems to be the rule. In other words the seller is held for all damages occasioned by a breach of such war-

ranty of soundness which are the natural and proximate result of the diseased animals coming in contract with sound animals. (Cummins v. Ennis, 4 Penn., (Del.) 424, 56 Atl., 377, Louis v. Bracken, 97 Ga., 337, 22 S. W. 943; Boylan v. McMillan, 137 Iowa, 142, 114 N. W., 630, Heenan v. Redman, 101 Ill. App., 603; Joy v. Bitzer, 77 Iowa, 73, L. R. A., 184.)

In the following cases this same rule has been held to embrace damages for loss caused by the spreading of disease to animals other than those infected at the time of the sale; Mitchell v. Pinckney, 127 Iowa, 696; McKee v. Jones, 67 Miss., 405; Long v. Clapp, 15 Neb., 417; Striker v. Crane, 33 Neb., 690; Packard v. Slack, 32 Vermont, 9; McCann. v. Ulman, 109 Wis., 574. But this rule applies only to cases where the seller knew that the purchaser would or probably might place the infected animals with others, in which case it would be the natural and necessary consequence of the seller's breach of warranty. It is also held in several of the cases above cited that the expenses incurred in caring for and doctoring the sick and diseased animals would be recoverable. However, it is also well settled that it is the duty of the purchaser to minimize the damages by the exercise of reasonable care and caution in protecting the sound animals from the infected animals. In the instant case it appears that the purchasers were fully advised and knew of the importance of promptly vaccinating these hogs against cholera. The hogs were delivered to the purchasers farm on the afternoon of May 10th, which was on Monday. The hogs were not vaccinated until Thursday following, and the veterination who vaccinated these hogs used the single treatment on the first vaccination. There is some conflict in the evidence as to the amount of serum that should have been used, and also as to the efficiency of the single treatment. We are of the opinion that by a preponderance of the evidence, only about thirty-two to thirty-four CCs of serum were used in the vaccination of each of these hogs. While the veterinarian who vaccinated these hogs stated in his examination in chief that he used about forty-five CCs to the 100 pounds of hogs, yet, from the other evidence in the record and the facts as developed on cross-examination, we think that by a preponderance of the evidence that the veterinarian only used about thirty-two to thirty-four CCs of serum to each of these hogs. The evidence of several other veterinarians whose depositions were taken is to the effect that this was wholly insufficient. The further question is made that these hogs should have been vaccinated, at least when it was found that two or three of the hogs had already died of cholera, and that there was cholera infection among the hogs, with the double treatment, and by which is meant the use of the vaccine virus with the serum. The same veterinarian who vaccinated these hogs by the single treatment on Thursday after the hogs were received on Mon-

day, about fourteen days later, did vaccinate the hogs again and then used the double treatment. There is some evidence in the record that the single treatment, and by which is meant the use of the serum without the virus, affords temporary immunity, and that the single treatment, the use of the serum alone, is as efficacious as the double treatment in affording temporary immunity, and that the single treatment, while temporary in its effects, lasting from three to six weeks, accomplished in the instant case as much as if the double treatment had been used. On the other hand other veterinarians testified that the double treatment should be administered, and especially after infection has appeared among the herd. A significant fact to be considered, is that the thirty-two or thirty-five hogs bought by Mr. Cloyes out of this same car load, and taken to his farm on the same day, were vaccinated with the double treatment, and in which about forty-five CCs of serum and 2 CCs of virus were used, and that none of these hogs died of cholera. One of them died from overheating in driving, and another died from injuries received in shipping, but none of them died from cholera. They had the same exposure as the 184 hogs bought by the Holmans out of the same car and the same stock pen at Union City.

We are of the opinion that had the purchaser used the double treatment in vaccinating these hogs, and had he vaccinated the same promptly, the mortality would have been much less, but it cannot be determined under this record just how much the mortality would have been reduced if these hogs had been promptly vaccinated and the double treatment used. One of these hogs died of cholera on the morning following their delivery at the farm of the defendants and the defendants both testify that several of the hogs appeared to be sick, and would not eat, and that the condition of several of them was such as to arouse their suspicion that they had cholera, and they promptly stopped payment on the check, and sought to get in communication with the seller, Youngblood, by telephone, and yet they delayed vaccinating the hogs until Thursday, and then only used the single treatment. In using the single treatment in vaccinating these hogs it clearly appears that the defendants acted upon their own judgment. They stated to Mr. Cloyes that they would only use the single treatment in vaccinating these hogs.

We are of the opinion that the defendants did not use ordinary and reasonable care and caution to stop the spread of this infection after they discovered infection among these hogs, and that they did not, therefore, exercise reasonable and ordinary care to minimize the damage.

The defendant S. W. Holman files a list of the hogs that died of the cholera, the dates on which they died, and the weights. From this list it appears that eleven of the hogs died from May 12th including

May 20th, and that the aggregate weight of these eleven hogs was 914 pounds. The Chancellor held that these eleven hogs were infected with the disease at the time of the sale, and that the other hogs which subsequently died of the disease became infected after the sale, and upon this finding he based his decree allowing $115.25 to be credited to the amount of the check sued on. The Chancellor also found that this sale occurred on May 9th, because it appears that the check was dated May 9th. We are of the opinion that the check was not properly dated, as it is conceded that the sale actually occurred on May 10th, and that the check was given in payment for the hogs at the time the sale was consummated, which was on Monday morning, May 10th. The Chancellor further held that by a preponderance of the evidence that the hogs infected with cholera at the date of sale would die within ten days from the time of infection. There was considerable conflict in the evidence as to the duration of time that a hog would live after being infected with cholera. It appears that there are three types of cholera, referred to as acute, sub-acute, and chronic, and that hogs having acute cholera will die within five to ten days from date of the development of the disease and that hogs with sub-acute infection will linger longer, and that hogs infected with chronic cholera will live for three or four weeks from the date of infection. Allowing the longest period from the date of infection to the date of death of hogs infected with acute cholera, as shown by the evidence, and we think by a preponderance of evidence, the period would be a maximum of twelve or fourteen days, depending largely upon the vitality of the animal at the time it became infected. Applying this rule, we find that from the 10th day of May to the 24th day of May that fifty-one of these hogs died, of an aggregate weight of 4305 pounds, and that the purchase price of 12½ cents per pound, this would be $538.12, as the value of these fifty-one hogs which died from the date of purchase, May 10th, to May 24th. By this admeasurement of the damages sustained on account of hogs actually diseased and infected on the date of sale, and the death of which would not have been prevented even though they had been properly vaccinated and segregated by the purchasers, the defendants would be entitled to have a modification of the decree of the Chancellor to the extent of $538.12 in place of $115.25 as decreed by the Chancellor.

While it is difficult to determine under the evidence in this record the number of hogs that were actually infected with cholera at the time of the sale, and which would in the usual course of events have died as the result of the infection, we are of the opinion that by a preponderance of the evidence the fifty-one hogs which died within the fourteen days after the sale must have been infected with the disease at the time of the sale. And while we hold that under the evidence contained in the record, the purchasers of these hogs did not

use ordinary care and caution to minimize the loss, and the hogs which died after the 24th day of May not having been infected at the time of the sale, and probably the first day or two after the sale, died as a result of the failure of defendants to properly vaccinate the hogs, both as to the delay in time of vaccinating, and in the use of the single treatment rather than the double treatment, and also by the insufficient quantity of serum administered to the hogs, the seller would be liable for the number of hogs which died as a result of cholera infection present at the time of the sale, because this number of hogs being infected at the time of the sale would have died in any event, and regardless of what methods of vaccination and segregation were employed by the purchaser.

It results that the decree of the Chancellor will be modified so as to fix the amount of credit to be given to the check sued on at $538.12 in place of $115.25, and that the decree in favor of original complainants be for the sum of $1206.88, and with this modification the decree of the Chancellor will be affirmed.

The cost of this appeal will be paid one-half by appellants, Holman and Holman, and sureties on their appeal bond, and one-half by the complainants Glover and Youngblood, and sureties on the bond filed for writ of error.

Judgment will be rendered here in favor of original complainants Glover and Youngblood and against the defendants S. B. and S. W. Holman for the sum of $1206.88, and the costs to be paid as decreed below, and the cost of the appeal to be paid as herein set out.

Owen and Heiskell, JJ., concur.